**Rudy LUTHER, Appellant,**

v.

**LOEWI & CO., INC. and Merrill J. Anderson, Appellees.**

No. 76–1464.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 15, 1976.

Decided Feb. 23, 1977.

S.Ct. 1251, 47 L.Ed.2d 444 (1976). Since the District Court did not reach this issue, we do not consider it here.

Curtis D. Forslund, Minneapolis, Minn., for appellant; James R. Lande, Minneapolis, Minn., on brief.

Joe A. Walters, Minneapolis, Minn., for appellee, Loewi & Co.; Kent E. Richey, Minneapolis, Minn., on brief.

Edward J. Parker, Minneapolis, Minn., for appellee, Merrill J. Anderson; Daryle L. Uphoff, Minneapolis, Minn., on brief.

Before HEANEY, ROSS and STEPHENSON, Circuit Judges.

STEPHENSON, Circuit Judge.

This appeal requires review of Rudy Luther's claim that Loewi & Co., Inc. and Merrill Anderson committed securities fraud and breach of an investment contract. Luther appeals from the district court's[1] judgment following a non-jury trial in favor of the defense. He contends the trial court's findings are clearly erroneous and further asserts the court erred in refusing to recognize a binding testimonial admission. We affirm.

Loewi is a brokerage firm with its principal office in Milwaukee and 35 branch offices. From 1965 until 1973 Merrill Anderson was employed by Loewi as a representative in its Minneapolis office. Anderson managed the account of William McKinstry, who wished to liquidate his ownership of National Car Rental Systems, Inc. stock. In connection with that liquidation in 1972, 3500 shares of National Car stock were oversold erroneously by Loewi. In an attempt initiated by Anderson to correct the error and upon a suggestion from McKinstry, Rudy Luther was contacted and asked whether he could deliver the 3500 shares of National Car stock necessary to complete the oversales.

An agreement between Luther and Anderson ensued, but the exact terms of the agreement are in dispute. Luther promised to deliver 3500 shares of National Car stock. According to Luther, Anderson guaranteed that he would credit Luther's account with the proceeds from the sale of the National Car stock and invest the proceeds in order to achieve a profit for Luther in an amount equivalent to double the difference between the prevailing market value of the 3500 shares and the value at which the oversale orders were executed.[2] In Anderson's view, his obligation to invest the proceeds from Luther's sale of the National Car stock was limited to one of exercising his "best efforts" rather than an absolute guarantee of a specified sum.

In any event, an account with Loewi was opened in Luther's behalf, and Anderson invested $16,373.50 credited to Luther's account in various underwritings and securities. The market value of Luther's investment rose to approximately $21,000 in June 1972. Luther was apprised of the status of his account through monthly statements received from Loewi. The stock market subsequently declined, however, and

---

1. The Honorable Gunnar H. Nordbye, Senior United States District Judge for the District of Minnesota.

2. The exact date of the Luther-Anderson agreement is uncertain, but the contract must have been formed either on February 7 or February 8, 1972. Loewi received $16,373.50 as proceeds from the sale of the National Car stock. The prevailing market value of the stock approximated $20,000 on February 7 and $21,000 on February 8. Luther claims, therefore, that his investment was expected to reach a value equivalent to $23,000 or possibly $25,000, depending on the recognized date of the agreement.

the value of Luther's account deteriorated to an amount of approximately $4,000.

Luther filed a complaint, stating that Loewi and Anderson had committed violations of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78a–78hh, and breach of contract. The district court, sitting without a jury, found that Luther was entirely satisfied with the investment of his funds and it was not until after the value of his stock declined that Luther became disenchanted and demanded payment. The trial court further found that, although Anderson may have been unduly optimistic as to expected profits and although Luther may have been naive in agreeing to the proposed plan, the deterioration in Luther's account was caused by the collapse of the stock market rather than by Anderson's failure to perform satisfactorily. The trial court concluded that there was no evidence of fraud, misrepresentation, poor business judgment or lack of good faith on the part of Anderson. The court stated "the evidence fully warrants a finding that as a stock broker Anderson exercised a high degree of care in procuring the best possible stock investments for the Luther account and that is all he agreed to do when the deal was made with Luther." Moreover, the court found that, although Loewi's central office was responsible to some extent for Anderson's failure to obtain desirable stocks for Luther's account, there was insufficient evidence that Loewi's main office was a direct cause of Anderson's inability to produce profitable investments for Luther. The court ordered payment to Luther of the remaining balance of his account but denied any further relief.

This is essentially a breach of contract case[3] concerning the scope of the Luther-Anderson investment agreement and the extent of its performance. Appellant contends Anderson made certain testimonial admissions that precluded the district court's determination that Anderson and Loewi did not breach the contract. For example, on cross-examination Anderson described his proposal to Luther as follows:

I said we needed delivery of 3,500 shares of National Car Rental stock and that if he would deliver the 3,500 shares to us we would utilize the proceeds from National Car Rental to purchase attractive underwritings which would result at some time in the near future in double the difference between the stock price it was sold and the current prevailing bid price which was approximately one point.

Appellant also focuses upon the following colloquy from Anderson's direct examination:

Q. In April, 1973 when you were leaving Loewi & Co., did you feel the Loewi Company and yourself as part of the Loewi Company in the relationship with Mr. Luther on this account, had let him down in any way? A. Sure, Mr. Luther had been let down. There was no question about it.

When a party's own testimony, if true, would defeat his right to a verdict, and such statement is not modified or explained, a verdict should be directed against him. See *Brown v. Poland*, 325 F.2d 984, 986 (10th Cir. 1963); *Bolam v. Louisville & Nashville R.R. Co.*, 295 F.2d 809, 811–12 (6th Cir. 1961); *Barnett v. Terminal R.R. Ass'n*, 228 F.2d 756, 761 (8th Cir.), cert. denied, 351 U.S. 953, 76 S.Ct. 850, 100 L.Ed. 1476 (1956). Nevertheless, Anderson's statements cannot be characterized as binding admissions in light of other aspects of his testimony providing modification and explanation. At numerous points in his testimony, Anderson stated that he promised Luther only his best efforts, that he utilized his best efforts to invest for Luther's benefit and that he did not guarantee Luther

---

3. In view of the district court's focus upon the contractual rather than the federal securities claim, it appears that the court exercised pendent jurisdiction in this case. Federal law claims should not be filed merely to invoke federal jurisdiction over a pendent count, but, because of the expenditure of judicial time and energy and the common nucleus of operative fact, we cannot say the court's action was inappropriate in the instant case. See *Federal Prescription Service, Inc. v. Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO*, 527 F.2d 269, 273–74 (8th Cir. 1975).

any premium. Anderson testified in the following manner:

Q. But you are testifying, are you not, that you didn't guarantee him any particular premium in any amount. All you said was that you were going to try. Isn't that what your statement is? A. "Guarantee" is a word that is foreign to my vocabulary after being in the business for 16 years or 17 years.

\* \* \* \* \* \*

Q. Did you have any discussion with Mr. Luther, assuming this conversation with him took place on February 8, that it was a good deal for him to deliver the stock to you at a price of $16,375 rather than sell it on the market for $21,000.

\* \* \* \* \* \*

A. The gist of the conversation was with Mr. Luther that we were going to use our best efforts and we were going to utilize the proceeds of the sale of the National Car Rental at the price of $16,-375 to acquire attractive securities including underwritings which would net him a profit of two to one, or double the profit between the figure of $16,375 and $20,-125. Our arithmetic at the time was based on the 3,500 shares times the one point difference, times double or two, which was equivalent to $7,000.

\* \* \* \* \* \*

Q. What you are saying is as a Registered Representative in charge of the account you used your best efforts in investing the proceeds of the National Car Rental sale stock in the account on Mr. Luther's behalf? A. Yes, sir. I did.

Q. You are saying you used good judgment?

A. I used my best judgment.[4]

Viewing the testimony in its totality, Anderson's opinion that Luther had been "let down" is most logically understandable as a mere expression of regret that the venture had not been successful and lacks the certainty and unequivocal nature of an absolute admission.[5]

Appellant also contends that various findings of the district court are clearly erroneous. We are bound by the well-established principle that an appellate court must take the view of the evidence and accept such

---

4. Anderson also answered specific questions as follows:

Q. [The Court]: Now tell us what he [Luther] said.

A. \* \* \* He said then, "What is there in it for me?" I said, "What we possibly could do in order to provide you with that incentive to sell that stock to us so that we could make this delivery of the 3,500 shares, we could utilize the proceeds of the sale of the stock—I think it was around $16,000—$15,000 or $16,000 as a result of the sale of the 3,500 shares of National Car Rental Stock, and we would use our best efforts then to invest in attractive securities including underwritings to achieve a twice the profit of what he would normally achieve by selling the block at current prevailing prices, which were not one point higher than they were when the over-sale occurred."

\* \* \* \* \* \*

Q. \* \* \* What did you say to Mr. Luther then to persuade him it was a good deal for him to deliver that stock to you at a price of $16,375 when he could have sold it on the market that very day for a price of $20,125? What did you say to Mr. Luther about that? A. The answer is pretty obvious by virtue of the testimony and I said I don't know how many times before that the arrangement we had with Mr. Luther was not to give him only the $20,125 but something in excess of that which was a premium and we would use our best efforts to do that. Mr. Luther wouldn't be selling the stock at the prevailing market price but as somewhat of a premium.

\* \* \* \* \* \*

Q. Mr. Anderson, you exercised your best efforts, did you not, on behalf of each and every single customer who was a client of yours? A. I certainly do and have never guaranteed to any of those same clients that I would get a dollar figure back.

\* \* \* \* \* \*

Q. As a matter of fact, you indicated to Mr. Luther that you were not merely going to *attempt* to do that, you were going to *do* it? A. I don't believe I said that in those terms and if you are trying to say that I was going to do it, absolutely guarantee it, the answer is no.

5. Appellant additionally asserts that David Klann, a vice president of Loewi, made conclusive admissions demonstrating his noncompliance with Loewi's obligation to Luther. Klann's testimony, however, merely emphasizes that Anderson, not Klann, was primarily responsible for managing Luther's investment.

reasonable inferences as tend to support the trial court's findings. *Salomon v. Crown Life Ins. Co.,* 536 F.2d 1233, 1234 (8th Cir.), *cert. denied,* — U.S. ——, 97 S.Ct. 387, 50 L.Ed.2d 329 (1976). The evidence must be interpreted in the light most favorable to the prevailing party. *See Mears v. Olin,* 527 F.2d 1100, 1103 (8th Cir. 1975).

Under this standard of review, the record reflects that Anderson's obligation was confined to utilization of his best efforts to invest in attractive underwritings or other securities in Luther's behalf and that the diminution in value of Luther's account was not attributable to Anderson's nonfeasance, but rather the collapse of the overall stock market. The record contains insufficient evidence demonstrating that Loewi's main office directly prevented Anderson from producing profitable investments for Luther through a failure to provide its Minneapolis branch with more attractive underwritings. Furthermore, · substantial evidence supports the trial court's determination that Anderson exercised a high degree of care in procuring the best possible stock investments for Luther's account and fulfilled the contract with Luther in good faith.

Affirmed.

ROSS, Circuit Judge, dissenting.

The practical effect of the primary factual determination by the trial court was that Mr. Luther sold 3,500 shares of stock to Loewi & Co., Inc. at a price at least $3,500 below the market price in exchange for a promise that Loewi would use its "best efforts" to make up the $3,500 loss plus another $3,500, but without any guarantee to even make up the $3,500 loss. I consider it to be illogical and highly unlikely that an intelligent investor would make such a stupid arrangement with his broker, and I further believe that if in fact such a one-sided deal *was* made, Loewi breached its ethical, if not its legal, responsibility to its customer.

These observations, coupled with the absolute admission by Anderson that a guarantee had been made, as set forth on page 4

of the majority opinion, and considering the equivocal nature of much of Mr. Anderson's other testimony, cause me to believe that the trial court made a clearly erroneous factual determination concerning the oral agreement and that the judgment should be reversed.